Harper, Ch.
delivered the opinion of the court.
We agree with the Chancellor, that the very informal instrument set forth in the decree, must be supported as a marriage contract.
It is hardly necessary to consider the ground chiefly debated (though perhaps not strictly involved m the case). If *37 any thing can be considered as settled, it is the settled law of this State, that where property is given or settled to the separate use of a married woman, she has no power to charge, encumber, or dispose of it, unless in so far as power to do so has been conferred on her by the instrument creating her estate; which power must be strictly pursued — in contradiction to many English cases, in which it has been held that she is a feme sole, with respect to her separate property, and may charge or dispose of it as she pleases, unless in so far as she is expressly restricted by the instrument. This has been the settled law since the decision in Ewing vs. Smith, cited in argument, (3 Des. Eq. R. 417) followed by a great number of cases decided in conformity to it, for a period of more than thirty years, and without any decision impugning or conflicting with it — though some dicta of judges were found, seeming to imply, that they thought the subject might still be open to consideration. But no such dictum or intimation has been found since the decision in Magwood & Patterson vs. Johnson, decided in 1833. I can say that, while at the bar, I considered the doctrine so well settled as not to make the question where it might have been raised, and as Chancellor, I have decided several cases involving the principle, in which it was not mooted. The general doctrine was not questioned in Cater vs. Eveleigh, in James vs. Mayrant, in Montgomery vs. Eveleigh, or in Magwood & Patterson vs. Johnson, though it was contended that the transactions in those cases came within the exception to it.
The court certainly does, sometimes, review its own decisions, and I am apprehensive there is too general a disposition to regard it a matter of course, that every question, however well settled, may be agitated again and again, and argued as de novo. Nothing can be better calculated to shake all confidence in the administration of Justice and the security of property. Where the operation of decided principle has been found inconvenient or injurious in practice, there is more reason that it should be reviewed and the mischief corrected. Though even when such consequences have been felt, yet if the decision has long obtained, and rights may have been acquired on the faith of it, the court refuses to interfere. But with respect to the decision in question, even those wh<x dissent from it on the score of authority, acknowledge the wholesomeness of its operation, and its tendency to promote the objects which the Court of Equity had in view, in recognizing a separate property in femes covert, and in protecting them against the influence or practices of their husbands; which might be exercised without the possibility of detection; as also to guard them against their own generous or devoted *38 impulses. The Judges who dissented 'from the opinion of the majority of Ewing vs. Smith, afterwards acceded to it, and I am yet to- learn that any inconvenience has followed to married women or their children — the objects of the court’s protection.
But it is contended that though this may be the law of our own State, yet this instrument must have effect according to the law of Georgia — the State in which it was made: that Georgia has generally adopted the English law, from which she is not known to have departed, and that we should determine according to the general current of the English decisions.
I do not know whether it is worth while to remark that, at the time our Act of 1721 was passed, adopting the principles and practice of Equity law, as administered in the high court of Chancery of South Britain, South Carolina and Georgia constituted one colony. Upon such a separation as that which afterwards took place, each party carried along with it its own laws — such as before had been common to both. It must be observed that, in following the case of Ewing vs. Smith, we are to regard it as a decision upon English'law; the court had no other law to decide upon; and if the decision be binding on us as authority — as every decision of our courts in the last resort must in general be— we must regard it a correct decision upon English law. The court disclaims all power to introduce new law; though they thought themselves at liberty, in deciding for a new community, amidst the conflicting decisions and jarring opinions of the English courts, to adopt such views of the law “ as might obviate the inconveniences of which the British courts had so much complained, and which seemed most conformable to general principle and the sounder opinions. And were they not so at liberty ? As I have said, we sometimes review our own decisions, when inconvenient consequences are found to follow from them; unless they have been so long established and followed, that the alteration might interfere with vested rights. In England, it may well be, that under the predominant current of decisions, for a great length of time, rights had become so fixed, and. property so disposed of, that the Judges who most strongly condemned those decisions, would not venture to depart from them. Such reasons would not apply to our own courts, deciding, so far as we know, for the first time. Was it not their duty to guard against the evils so loudly complained of in the country from which our laws are derived ? They were as much at liberty to review the English decisions as their own.
*39 I need not do that which has been done before by abler men; compare and collate the cases (though I have examined many of them) with a view to shew that they are uncertain and contradictory between themselves; many of them referable to no fixed principle, and a source of embarrassment and regret to the ablest Judges who have administered the English Chancery law. I need only, for this purpose, refer to the opinion of Chancellor Kent in the case of the Methodist Episcopal Church vs. Jaques, 3 John. Ch. 77— and indeed to the dissenting opinion of Chancellor DeSaussure, in Ewing vs. Smith. It is true, that the decision of Chancellor Kent in the former case, was overruled by the Court of Errors of New-York. But neither the one decision nor the other, is conclusive on us as authority: they only receive the consideration to which their reason and justice may seem to entitle them. The opinion of the Court of Errors seems to have a strong leaning against the making of any separate provision for a married woman, and in favor of carrying back the doctrine to that of the old common law; by which the existence of the wife is, to every purpose, merged in that of the husband. But whatever may be the opinion as to the superior strength of the argument for each decision, I think the argument of Chancellor Kent quite sufficient for this purpose — to shew that, in adopting the doctrine of Ewing vs. Smith, the Court was guilty of no usurpation or flagrant violation of unquestioned principles; but might well adhere to that which seemed the safer and better rule. It might be different in relation to the present case, if it were shewn that a different course had been pursued in the Courts of Georgia, the State in which the contract was made; but this was not alleged or shewn.
Were the cases, contradictory ? I believe no one has attempted to reconcile the case of Sackett vs. Wray, 4 Br. Ch. Ca. 473, and other cases to the same purport, with Pylus vs. Smith, 3 Br. Ch. Ca. 340; 1 Ves. Jr. 189, and others which are supposed to be the more numerous and governing English decisions. The former cases are said to be opposed to the current of previous decisions, and to be overruled by subsequent ones. It is held, in consequence of the general expression, that a married woman must be regarded a feme sole in relation to her separate estate; that although a particular method of charging or disposing of her separate estate is directed by the instrument creating it, yet she may charge or dispose of it any way she thinks proper — in violation of the general principle, that expressio unius exclusio alterius. In Jones vs. Harris, 9 Ves. 497, Lord Eldon thought it a doubtful question, and deserving a very full review, whether a mar *40 ried -woman could charge her separate property in any other manner than that prescribed by the deed. If he was prepared to review, he was not unprepared to reverse, the previous decisions, by which he so far considered himself bound. So in Parker vs. White, 11 Ves. 209, this Judge declares his mind to be in a state of great distraction on the subject, and elsewhere speaks of the law’s being in a distracted state. There are contradictory cases, whether a married woman can bind her separate estate by her general personal engagement, without a specific charge. And supposing her to have such power, there are various cases inconsistent with each other or separated by impalpable distinctions. It has been questioned, whether such engagements must be in writing — by note or bond' — or whether air express verbal promise will do, or whether an implied undertaking will be sufficient. Yet, I think there was a stronger equity against the wife in the cases of Duke of Bolton vs. Williams, and in Jones vs. Harris, where the wife herself had received the money, than in Hulme vs. Tenant, where she became bound for her husband’s debt. The former were cases of an implied undertaking. The case cited by the Chancellor, of Murray vs. Barllee, in which a married woman was living apart from her husband, was one in which a verbal promise was held to bind the separate estate. That case may, perhaps, be supported on the ground that, apart from the express promise, the services of the lawyer constituted a necessary part of the expenses of the trust estate. The husband could not be expected to pay the costs of the suit against him. If there was any thing which could be considered necessary to the trust estate, it was that the wife’s title to it might be vindicated, and its possession or profits recovered or secured to her. It might well come within the distinction laid down in Magwood & Patterson vs. Johnson, 1 Hill 228, that when a person has paid his money or given credit to effect the purposes of the trust, he may have an equity to stand in the place of the cestui que trust for his reimbursement. The ridicule of the distinction between written, verbal, or implied engagements only proves that such distinctions existed, and were insisted on. Questions have been made in the case of a trust merely to the separate %ise of a married woman, without specifying any method of appointment or disposition; whether she must necessarily have the power of making a will, or what was the further extent of her power.
There has been a conflict also, in cases where the trust was, generally, to pay rents and profits into the hands of a married woman, or to pay them from time to time. In short, doubt,' contradiction and uncertainty overspread the whole *41 mass of decisions growing out of the fundamental doctrine— that in the disposal of her separate property a married woman is to be regarded as a feme sole ; so as well to justify the complaint of Mr. Sugden, in his treatise on Powers, p. 114, that it is almost impossible for a practitioner to advise confidently in any case where the very words have not received a judicial determination. From this labyrinth, the case of Ewing vs. Smith has happily extricated us, and I feel no disposition to plunge into it again. I believe it may be said, that since the time of Lord Hardwicke, hardly any Judge has sat on an. English Chancery bench, before whom the subject was brought, who has not condemned the doctrine or some of its modifications.
It is contended, however, that this is a case in which the requisite power has been conferred on the wife by the settlement; the property being placed at her “sole direction and free disposal.” Suppose this equivalent to a power to give, sell or charge at her discretion; and the question is, does the joining her husband in the notes of hand, constitute a charge on her separate estate 1 This is, in fact, but a modification of the doctrine we have already considered ; and one of those which the English Judges have regarded as most exceptionable. Lord Thurlow perceived the absurdity, in the case of Hulme vs. Tenant, the case principally relied on — that by the execution of an instrument purporting to bind herself personally, which she could not do, and which, by the general law, was absolutely void, she might bind her separate estate. He yielded to the weight of previous authorities, determining that a married woman was a feme sole with respect to her separate estate; and if a feme sole, that-, her estate must be bound by all her engagements. It was in relation to this case, that the strong expressions were used by Lord Roslynn, in Whistler vs. Newman, 4 Ves. 143,— that “nothing could be more perfectly without all law than the bond in that case.” “ It seems to require this principle in all its extent; that where the married woman has the property in the principal or dividends, whatever disposition she makes of it, if it is her pleasure to do it, even in so absurd a way as by giving a bond, supposing her to know she is doing it, this Court will support ii and build upon it. It takes away all the protection from married women, and makes trusts for their benefit of little importance.” Lord Alvanly expressed himself hardly less strongly, and so said Lord Thurlow, though he conceived himself bound by authority; and none more frequently than Lord Eldon, who often expressed his wish that the cases should be reviewed. The eases are very well collated *42 and commented upon by Mr. Clancey in his treatise on Marriage Settlements, p. 137.
But it is a misconception to suppose that this point of the case is to be separated from the general doctrine I have considered. A married woman is supposed to bind her property by her general engagements, because with respect to it she is regarded as a feme sole.
But though it has sometimes been said in relation to our doctrine, that she is only a feme sole sub modo, or to the extent that the settlement makes her so; yet these expressions are inaccurate. She can, in no manner of respect, be considered a feme sole. A feme sole disposes of, or charges, hex-property by her own' act, and according to her own will, by her inherent power as owner. A feme covert exercises a delegated authority, and cannot exceed it. She is enabled to execute a power, as, in some instances, any third person— feme covert or other — even those having no interest in the property, might be enabled to execute it, and bind her by their act. ■ The case of Clarke vs. McKenna, Cheves Eq. 163, rested on no authority of the wife to bind her property as a. feme sole, but upon the terms of the instrument, by which, the property was made liable to her “ debts and contracts.” This resulted from the power of the grantor over the property.
It follows, that the notes in question in this case were void, both at law and in equity, the complainant having no power to charge her estate in that way.
It is hardly necessary to advert to a distinction attempted to be enforced, between a case in which the wife has the fee, and those in which she has only a particular estate. Nor should I do so, but for a suggestion thrown out in the circuit opinion of a Judge to all whose suggestions I listen with deference. But this does not amount even to a dictum, and I have found no such suggestion in any other case. The case of Ewing vs. Smith was one in which the wife had joined her husband in a bond, and payment was sought out of a fund of which the property was her’s absolutely. The truth is, that the protection of the Court is more necessary and useful where the wife has the absolute property, than where she has a particular estate. If there be a life estate with remainder to children, or contingent limitations, she cannot defeat these by any disposition of her estate, any more than in any other case of a life estate with remainders. The power to dispose of her own estate, does not imply that she may dispose of the estates of others. But if she squanders the fee, children may be left destitute, when by restraining her power of disposition, the property might be secured to them.
*43 'It is ordered and decreed, that the decree of the Chancellor be reversed, and that the defendant, Peter Lamar, deliver up to the complainant the slaves in question, and account for' their hire, and that the cross bill be dismissed.
Johnston, Ch. and Dunkin, Ch., concurred.
Decree reversed.